**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| SHANTAVIA SPIKES, derivatively on behalf of HUMANA INC. | |
| Plaintiff, | Case No.  3:24-CV-590-RGJ |
| vs. | |
| BRUCE D. BROUSSARD, SUSAN M. DIAMOND, KURT J. HILZINGER, RAQUEL C. BONO, FRANK A. D'AMELIO, DAVID T. FEINBERG, WAYNE A.I. FREDERICK, JOHN W. GARRATT, KAREN W. KATZ, MARCY S. KLEVORN, JORGE S. MESQUITA, BRAD D. SMITH, DAVID A. JONES, JR., JAMES J. O'BRIEN, and WILLIAM J. MCDONALD | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| HUMANA INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Shantavia Spikes ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Humana Inc. ("Humana" or the "Company"), files this Verified Shareholder Derivative Complaint against Bruce D. Broussard ('Broussard"), Susan M. Diamond ("Diamond"), Kurt J. Hilzinger ("Hilzinger"), Raquel C. Bono ("Bono"), Frank A. D'amelio ("D'amelio"), David T. Feinberg ("Feinberg"), Wayne A.I. Frederick ("Frederick"), John W. Garratt ("Garratt"), Karen W. Katz ("Katz"), Marcy S. Klevorn ("Klevorn"), Jorge S. Mesquita ("Mesquita"), Brad D. Smith ("Smith"), David A. Jones, Jr. ("Jones"), James J. O'Brien

1

("O'Brien"), and William J. McDonald ("McDonald") (collectively, the "Individual Defendants," and together with Humana, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Humana, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Humana, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Humana's directors and officers from July 27, 2022 to January 24, 2024, both dates inclusive (the "Relevant Period").

2.    Humana, headquartered in Louisville, Kentucky, is the fourth largest health insurance provider in the United States. The Company's insurance segment provides services to approximately 17 million members and, in 2023, made up 97.1% of the Company's retail revenues. Humana's insurance services include individual Medicare plans (which constitute about 74% of the Company's retail revenues), group Medicare plans (which constitute about 6.5% of the

Company's retail revenues), prescription drug plans, commercially fully-insured plans, and specialty medical benefit plans.

3.      On July 27, 2022, Humana issued a press release that announced the Company's financial results for the second quarter of 2022, reporting adjusted earnings per share ("EPS") of $8.67 for the second quarter, an "outperformance" of approximately $1.00 per share higher than Humana's prior projections. The press release stated that Humana's "outperformance" was "driven primarily by . . . better-than-anticipated medical cost trends in the company's individual Medicare Advantage and Medicaid businesses" and further explained that medical costs for Humana's individual Medicare Advantage business were "running favorable to our expectations."

4.      During the Relevant Period, the Individual Defendants caused Humana to represent to the investing public that "in-patient unit costs and non-in-patient trends [were] coming in lower than [Humana] initially estimated" and that "there really isn't pent-up demand that [Humana has] to be concerned about" negatively affecting utilization rates and profitability.

5.      On June 13, 2023, the truth began to emerge when UnitedHealth Group Inc. ("UnitedHealth"), one of the Company's main health insurance competitors, revealed that it was seeing "higher levels" of outpatient care activity and suggested that elevated utilization rates were occurring because of "pent-up demand or delayed demand being satisfied." Further, UnitedHealth revealed that it was "seeing very strong volumes" in certain areas, such as ambulatory surgery, and an overall "higher number of cases that are being performed." Since Humana and UnitedHealth's businesses are so similar, UnitedHealth's disclosure revealed that Humana was probably experiencing elevated utilization and costs from pent-up demand as well.

6.      On this news, the price per share of Humana stock fell $57.63, or 11%, from closing at a price of $512.63 per share on June 13, 2023, to close at a price of $455.00 per share on June 14, 2023.

7.      Three days later, on June 16, 2023, the truth continued to emerge when Humana admitted that it also was experiencing "higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries, and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns." The Company also revealed that, regarding its prior forecast for its insurance segment benefits expense ratio of between 86.3% and 87.3%, it now anticipated to end the year at the higher end of that range. Further to the point, Humana noted that it now "assume[d] it will continue to experience moderately higher-than-expected trends for the remainder of the year."

8.      On this news, the price per share of Humana stock fell $18.20, from closing at a price of $463.85 per share on June 15, 2023, to close at a price of $445.65 per share on June 16, 2023.

9.      On January 18, 2024, the truth continued to emerge when the Company preliminarily released its financial results for the fourth quarter and full-year 2023 through a current report filed on Form 8-K with the SEC. The Form 8-K revealed that Humana's benefits expense ratio rose to approximately 91.4% for the fourth quarter of 2023 and approximately 88% for the full year 2023.

10.      On this news, the price per share of Humana stock fell $35.78, from closing at a price of $447.76 per share on January 17, 2024, to close at a price of $411.98 per share on January 18, 2024.

11.     On January 25, 2024, the truth fully emerged when Humana issued a press release that revealed a loss for the fourth quarter of 2023 and that the Company anticipated the higher level of medical costs would continue for the entirety of 2024.

12.     On this news, the price per share of Humana stock fell $47.04, or 12%, from closing at a price of $402.40 per share on January 24, 2024, to close at a price of $355.36 per share on January 25, 2024.

13.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Humana's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1) Humana had downplayed the negative effects that elevated medical costs arising from pent-up demand for healthcare procedures as the COVID-19 pandemic waned would have on Humana's adjusted EPS; (2) due to the foregoing, Humana experienced elevated utilization rates and costs; (3) the Company failed to maintain internal controls; and (4) in light of the above, the individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing Humana to repurchase its own stock at artificially inflated rates. Indeed, between November 2022 and January 2024, approximately 6.5 million shares of Humana common stock were repurchased. Since the repurchased stock was only worth $355.36 per share, which was the adjusted price at close of trading on January 24, 2024, Humana overpaid by over $787 million.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, netting aggregate proceeds exceeding $30.6 million.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of Delaware (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. §

78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Humana is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Humana. Plaintiff has continuously held shares of Humana common stock at all relevant times.

24.     Plaintiff is a citizen of Ohio.

### Nominal Defendant Humana

25.     Humana is a Delaware corporation with principal executive offices at 500 West Main Street, Louisville, Kentucky 40202. Humana common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HUM."

**Defendant Broussard**

26.     Defendant Broussard served as Humana's CEO and as a Company director from 2013 until July 1, 2024. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Broussard received $17,198,844 in total compensation from the Company. This included $1,349,465 in salary, $9,638,547 in stock awards, $2,785,410 in option awards, $3,072,394 in non-equity incentive plan compensation, and $353,028 in all other compensation. For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Broussard received $16,327,384 in total compensation from the Company. This included $1,469,893 in salary, $10,898,833 in stock awards, $3,492,874 in option awards, and $465,784 in all other compensation.

27.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Broussard made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 3, 2022 | 9,000 | $566.17 | $5,095,566 |
| December 12, 2022 | 7,000 | $531.92 | $3,723,439 |
| February 27, 2023 | 17,575 | $505.85 | $8,890,225 |

Thus, in total, before the fraud was exposed, he sold 33,575 shares of Company stock on inside information, for which he received approximately $17,709,230 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28. The Schedule 14A the Company filed with the SEC on March 8, 2024 (the "2024 Proxy Statement") stated the following about Defendant Broussard:

> Bruce D. Broussard, Chief Executive Officer, joined Humana in 2011. Under his leadership, Humana has created an integrated care delivery model centered on improving health outcomes, driving lower costs, enhancing quality, and providing a simple and personalized member experience. With its holistic, human care approach, Humana is dedicated to improving the health of the communities it serves by making it easier for people to achieve their best health.

> Bruce brings to Humana a wide range of executive leadership experience in publicly traded and private organizations within a variety of healthcare sectors, including oncology, pharmaceuticals, assisted living/senior housing, home care, physician practice management, surgical centers and dental networks. Prior to joining Humana, Bruce was Chief Executive Officer of McKesson Specialty/US Oncology, Inc. US Oncology was purchased by McKesson in December 2010. At US Oncology, Bruce served in a number of senior executive roles, including Chief Financial Officer, President, Chief Executive Officer and Chairman of the Board.

> Bruce plays a leadership role in key business advocacy organizations such as the Business Council, and the American Heart Association CEO Roundtable. He is a member of the Board of Directors of HP Inc. and is a member and previous chair of AHIP. Additionally, Bruce serves on the Board of the Trust for the National Mall, a nonprofit philanthropic partner of the National Park Service dedicated to restoring and preserving the National Mall.

29. Upon information and belief, Defendant Broussard is a citizen of Kentucky.

**Defendant Diamond**

30. Defendant Diamond has served as the Company's CFO since June 2021. For the 2022 Fiscal Year, Defendant Diamond received $4,810,998 in total compensation from the Company. This included $750,000 in salary, $2,258,317 in stock awards, $652,754 in option awards, $975,750 in non-equity incentive plan compensation, and $174,177 in all other compensation. For the 2023 Fiscal Year, Defendant Diamond received $4,730,733 in total compensation from the Company. This included $790,000 in salary, $2,802,776 in stock awards, $898,145 in option awards, and $239,812 in all other compensation.

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Diamond made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 3, 2022 | 5,623 | $566.17 | $3,183,602 |
| May 4, 2022 | 4,156 | $526.38 | $2,187,647 |

Thus, in total, before the fraud was exposed, she sold 9,779 shares of Company stock on inside information, for which she received approximately $5,371,249 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

32.     The Company's website, as of September 26, 2024, stated the following about Defendant Diamond:

> Susan Diamond serves as Humana's Chief Financial Officer, with responsibility for all accounting, actuarial, analytical, financial, internal audit, investor relations, risk management, tax, and treasury activities. She is a member of the Management Team, which sets the firm's strategic direction, and reports to President and Chief Executive Officer Jim Rechtin.
>
> Susan has spent the majority of her tenure with Humana in various leadership roles in the Medicare business, with a particular passion and emphasis on growth and consumer segmentation strategies for the company's Individual Medicare Advantage and Stand Alone Part D offerings. Susan also served for two and a half years as the Enterprise Vice President of Finance, where she was responsible for enterprise planning and forecasting, trend analytics and had responsibility for each of the company's line of business CFOs and controllers. Susan most recently held the position of Segment President, Home Business (July 2019-June 2021) and Interim Chief Financial Officer (June 2021) and during this time she led the acquisition of the remaining 60 percent interest in Kindred at Home valued at $5.7 billion, the largest acquisition in Humana's history, as well as onehome, a provider and convener of home-based services and care and risk manager, to further accelerate the development of Humana's value-based home health offering.
>
> Prior to Humana, Susan spent six years working in various financial leadership roles for early stage, venture backed technology companies, and five years as the Chief Financial Officer for a Louisville based venture capital firm, working with early stage companies across a variety of industries.

10

Susan earned a Bachelor of Arts in Accounting from Bellarmine College (now Bellarmine University) and is a licensed certified public accountant (inactive). She currently serves on the Board of Directors of PepsiCo, Inc. (NASDAQ: PEP), DispatchHealth, Gentiva, and The Louisville Orchestra, Inc.

33.   Upon information and belief, Defendant Diamond is a citizen of Kentucky.

**Defendant Hilzinger**

34.   Defendant Hilzinger has served as a Company director since July 2003 and as Chairman of the Board since January 2014. For the 2022 Fiscal Year, Defendant Hilzinger received $605,265 in total compensation from the Company. This included $372,000 in fees earned or paid in cash, $189,969 in stock awards, and $43,296 in all other compensation. For the 2023 Fiscal Year, Defendant Hilzinger received $601,300 in total compensation from the Company. This included $368,000 in fees earned or paid in cash, $190,129 in stock awards, and $43,171 in all other compensation.

35.   The 2024 Proxy Statement stated the following about Defendant Hilzinger:

Kurt J. Hilzinger was initially elected to the Board in July 2003, and was elected Chairman of the Board effective January 1, 2014. Mr. Hilzinger served as Lead Director from August 2010 until his appointment as Chairman. Mr. Hilzinger is a Partner at Court Square Capital Partners, an independent private equity firm, having held this position since November 2007. At Court Square, Mr. Hilzinger focuses principally on investments in the healthcare industry. Prior to that, he was a Director of AmerisourceBergen Corporation from March 2004 to November 2007; having previously served as President and Chief Operating Officer of AmerisourceBergen Corporation from October 2002 to November 2007, and as Executive Vice President and Chief Operating Officer from August 2001 to October 2002. Mr. Hilzinger also serves on the Board of Directors of Outlook Therapeutics, Inc. and several privately held companies.

36.   Upon information and belief, Defendant Hilzinger is a citizen of Pennsylvania.

**Defendant Bono**

37.   Defendant Bono has served as a Company director since September 2020. She also serves as a member of the Audit Committee and the Clinical Quality Committee. For the 2022

Fiscal Year, Defendant Bono received $312,951 in total compensation from the Company. This included $120,000 in fees earned or paid in cash and $189,969 in stock awards. For the 2023 Fiscal Year, Defendant Bono received $345,029 in total compensation from the Company. This included $124,000 in fees earned or paid in cash, $190,129 in stock awards, and $30,900 in all other compensation.

38.   The 2024 Proxy Statement stated the following about Defendant Bono:

Raquel C. Bono, M.D., was initially elected to the Board in September 2020. Dr. Bono is a Principal at RCB Consulting having held this position since October 2019. Dr. Bono most recently served as Chief Health Officer at Viking Cruises from November 2020 until her retirement in December 2023. Prior to Viking Cruises, Dr. Bono, a board-certified trauma surgeon and retired Vice Admiral, U.S. Navy Medical Corps, previously served as the Chief Executive Officer and Director for the Defense Health Agency (DHA). In this capacity, Dr. Bono led a joint, integrated combat support agency that enables all branches of the U.S. military medical services to provide health care services to combatant commands in times of both peace and war. Dr. Bono integrated an unprecedented $50 billion worldwide health care enterprise for the Army, Navy, Air Force, and Marine Corps, composed of 50 hospitals and 300 clinics that provide care to 9.5 million military personnel, oversaw the Department of Defense deployment of the electronic health record, and facilitated the collaboration between the largest federated health systems of the Department of Defense and Department of Veterans Affairs (VA). An American College of Surgeons (ACS) Fellow since 1991, Dr. Bono served on the ACS Board of Governors and the Governors Health Policy and Advocacy Workgroup. She has been honored with the Defense Distinguished Service Medal, three Defense Superior Service Medals, four Legion of Merit Medals, two Meritorious Service Medals, and two Navy and Marine Corps Commendation medals. Dr. Bono currently serves on the Board of Directors of Alcon, Inc.

39.   Upon information and belief, Defendant Bono is a citizen of Texas.

**Defendant D'Amelio**

40.   Defendant D'Amelio has served as a Company director since September 2003. He also serves as a member of the Nominating, Governance & Sustainability Committee and as the Chair of the Audit Committee. For the 2022 Fiscal Year, Defendant D'Amelio received $368,778 in total compensation from the Company. This included $145,000 in fees earned or paid in cash,

$189,969 in stock awards, and $33,809 in all other compensation. For the 2023 Fiscal Year, Defendant D'Amelio received $363,550 in total compensation from the Company. This included $145,000 in fees earned or paid in cash, $190,129 in stock awards, and $28,421 in all other compensation.

41.     The 2024 Proxy Statement stated the following about Defendant D'Amelio:

Frank A. D'Amelio was initially elected to the Board in September 2003. Mr. D'Amelio was formerly Executive Vice President, Chief Financial Officer at Pfizer Inc. having held this position from January 2022 until May 2022. Mr. D'Amelio began his career at Pfizer in 2007 and since then has held various roles of increasing responsibility, including, SVP & Chief Financial Officer (September 2007-December 2010), Executive Vice President, Business Operations and Chief Financial Officer (January 2011-October 2018) and Chief Financial Officer and Executive Vice President, Global Supply (November 2018-December 2021). Prior to that, Mr. D'Amelio was Senior Executive Vice President of Integration and Chief Administrative Officer at Alcatel-Lucent from December 2006 to August 2007, and Chief Operating Officer of Lucent Technologies Inc. from February 2006 to November 2006. From May 2001 until January 2006, he was Executive Vice President, Administration and Chief Financial Officer of Lucent. Mr. D'Amelio also serves on the Board of Directors of Zoetis, Inc., Hewlett Packard Enterprises and Catalent, Inc.

42.     Upon information and belief, Defendant D'Amelio is a citizen of New York.

**Defendant Feinberg**

43.     Defendant Feinberg has served as a Company director since March 2022. He also serves as a member of the Nominating, Governance & Sustainability Committee and as the Chair of the Clinical Quality Committee. For the 2022 Fiscal Year, Defendant Feinberg received $311,185 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $189,969 in stock awards, and $1,282 in all other compensation. For the 2023 Fiscal Year, Defendant Feinberg received $321,517 in total compensation from the Company. This included $145,000 in fees earned or paid in cash, $190,129 in stock awards, and $28,421 in all other compensation.

44.     The 2024 Proxy Statement stated the following about Defendant Feinberg:

David T. Feinberg, M.D., was initially elected to the Board in March 2022. Dr.
Feinberg is Chairman of Oracle Health, where he is committed to making
healthcare more accessible, affordable, and equitable. His work advances thought
leadership and strategy related to unleashing the healing power of data through an
open and connected healthcare ecosystem. Previously, Dr. Feinberg served as
President and Chief Executive Officer and member of the Board of Directors of
Cerner Corporation (Cerner), which is now Oracle Health. In that role Dr. Feinberg
focused on delivering tools and technology to help caregivers optimize the health
of their patients and communities.

Dr. Feinberg joined Cerner from Google, where he held the position of Vice
President of Google Health since 2019 and led Google's worldwide health efforts,
bringing together groups from across Google and Alphabet that used artificial
intelligence, product expertise and hardware to tackle some of healthcare's biggest
challenges, and was responsible for organizing and innovating Google's various
healthcare initiatives. Prior to Google, he served as President and CEO of
Geisinger Health where he led an operational turnaround, and pushed the use of
new platforms and tools, including an IT system called a Unified Data Architecture
that allowed the company to integrate big data into existing data analytics and
management systems. During his Geisinger tenure, Dr. Feinberg also introduced
programs and services to put a greater focus on precision medicine and better
patient care. Prior to Geisinger, Dr. Feinberg worked at UCLA for more than 20
years and served in a number of leadership roles, including President, CEO and
Associate Vice Chancellor of UCLA Health Sciences, Vice Chancellor and CEO
for the UCLA Hospital System, and CEO of UCLA's Ronald Reagan Medical
Center.

Dr. Feinberg earned his undergraduate degree at the University of California,
Berkeley. He graduated with distinction from the University of Health
Sciences/Chicago Medical School. He completed an internship in pediatrics at
Loyola University Medical Center, and residency and fellowship training in
psychiatry, addiction psychiatry, and child and adolescent psychiatry at the UCLA
School of Medicine. He earned a Master of Business Administration from
Pepperdine University. Dr. Feinberg is a member of the Alpha Omega Alpha
Medical Honor Society, a Distinguished Fellow of American Psychiatric
Association and received the Cancro Academic Leadership Award from the
American Academy of Child & Adolescent Psychiatry. Dr. Feinberg also serves on
the Board of Directors of Douglas Emmett Inc.

45.     Upon information and belief, Defendant Feinberg is a citizen of California.

**<u>Defendant Frederick</u>**

46.     Defendant Frederick has served as a Company director since February 2020. He also serves as a member of the Organization & Compensation Committee and as a member of the Clinical Quality Committee. For the 2022 Fiscal Year, Defendant Frederick received $350,674 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $189,969 in stock awards, and $40,705 in all other compensation. For the 2023 Fiscal Year, Defendant Frederick received $364,874 in total compensation from the Company. This included $133,300 in fees earned or paid in cash, $190,129 in stock awards, and $41,445 in all other compensation.

47.     The 2024 Proxy Statement stated the following about Defendant Frederick:

Wayne A. I. Frederick, M.D., was initially elected to the Board in February 2020. Dr. Frederick is the President Emeritus of Howard University, having previously served as the 17th President from July 2014 - September 2023, and is the distinguished Charles R. Drew Professor of Surgery at the Howard University College of Medicine. He is also a practicing cancer surgeon at Howard University Hospital. Prior to that Dr. Frederick served as Howard University's Interim President (elected October 2013) after serving as Provost and Chief Academic Officer for more than a year. Following his post-doctoral research and surgical oncology fellowships at the University of Texas MD Anderson Cancer Center, Dr. Frederick began his academic career as Associate Director of the Cancer Center at the University of Connecticut. Upon his return to Howard University, his academic positions included Associate Dean in the College of Medicine, Division Chief in the Department of Surgery, Director of the Cancer Center and Deputy Provost for Health Sciences. He also earned a Master of Business Administration degree from Howard University's School of Business in 2011. Dr. Frederick is a fellow of the American College of Surgeons (ACS) and belongs to numerous surgical and medical organizations, including, the ACS' Academy of Master Surgeon Educators, the American Surgical Association and the National Academy of Medicine. Dr. Frederick also serves on the Board of Directors of Agostini Limited, Insulet Corporation, Workday, Inc. and Mutual of America Life Insurance Co. in addition to a few other privately held companies and charitable organizations.

48.     Upon information and belief, Defendant Frederick is a citizen of Washington DC.

**Defendant Garratt**

49.     Defendant Garratt has served as a Company director since February 2020. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. For the 2022 Fiscal Year, Defendant Garratt received $326,311 in total compensation from the Company. This included $135,000 in fees earned or paid in cash, $189,969 in stock awards, and $1,342 in all other compensation. For the 2023 Fiscal Year, Defendant Garratt received $326,033 in total compensation from the Company. This included $135,000 in fees earned or paid in cash, $190,129 in stock awards, and $904 in all other compensation.

50.     The 2024 Proxy Statement stated the following about Defendant Garratt:

John W. Garratt was initially elected to the Board in February 2020. Mr. Garratt was formerly the President and Chief Financial Officer of Dollar General Corporation, having held this position from September 2022 to June 2023. Mr. Garratt joined Dollar General in October 2014 as Senior Vice President, Finance & Strategy and subsequently served as Interim Chief Financial Officer from July 2015 to December 2015 and most recently served as Executive Vice President and Chief Financial Officer from December 2015 to September 1, 2022. Prior to joining Dollar General, Mr. Garratt held various positions of increasing responsibility with Yum! Brands, Inc., one of the world's largest restaurant companies, between May 2004 and October 2014, holding leadership positions in corporate strategy and financial planning. Mr. Garratt served as Vice President, Finance and Division Controller for the KFC division and earlier for the Pizza Hut division and for Yum Restaurants International between October 2013 and October 2014. Mr. Garratt also served as the Senior Director, Yum Corporate Strategy, from March 2010 to October 2013, reporting directly to the corporate Chief Financial Officer and leading corporate strategy as well as driving key cross-divisional initiatives. Mr. Garratt served in various other financial positions at Yum from May 2004 to March 2010. Prior to his career at Yum! Brands, Mr. Garratt served as Plant Controller for Alcoa Inc. between April 2002 and May 2004, and held various financial management positions at General Electric from March 1999 to April 2002. He began his career in May 1990 at Alcoa, where he served for approximately nine years. Mr. Garratt also serves on the Board of Directors of Papa John's International, Inc. and Cracker Barrel Old Country Store, Inc.

51.     Upon information and belief, Defendant Garratt is a citizen of Tennessee.

**Defendant Katz**

52.     Defendant Katz has served as a Company director since September 2019. She also serves as the Chair of the Nominating, Governance & Sustainability Committee and as a member of the Organization & Compensation Committee. For the 2022 Fiscal Year, Defendant Katz received $344,267 in total compensation from the Company. This included $135,000 in fees earned or paid in cash, $189,969 in stock awards, and $34,298 in all other compensation. For the 2023 Fiscal Year, Defendant Katz received $346,554 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $190,129 in stock awards, and $26,425 in all other compensation.

53.     The 2024 Proxy Statement stated the following about Defendant Katz:

Karen W. Katz was initially elected to the Board in September 2019. Ms. Katz was most recently interim CEO of Intermix, LLC from June 2022 to December 2022. Prior to Intermix, Ms. Katz served as the President and CEO of Neiman Marcus Group LTD LLC from 2010 to February 2018. Neiman Marcus Group is an international multibrand omni-channel retailer whose portfolio of brands includes Neiman Marcus, Bergdorf Goodman and MyTheresa. Having joined Neiman Marcus in 1985, Ms. Katz served in key executive and leadership roles in the company's merchant, stores and eCommerce organizations as Executive Vice President—Stores, a member of the Office of the Chairman of Neiman Marcus Group, and President, Neiman Marcus Online, and President and CEO, Neiman Marcus Stores. Ms. Katz currently serves on the Board of Directors of Under Armour, Inc. and The RealReal, Inc.

54.     Upon information and belief, Defendant Katz is a citizen of Texas.

**<u>Defendant Klevorn</u>**

55.     Defendant Klevorn has served as a Company director since February 2021. She also serves as the Chair of the Technology Committee and as a member of the Audit Committee. For the 2022 Fiscal Year, Defendant Klevorn received $342,425 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $189,969 in stock awards, and $22,456 in all other compensation. For the 2023 Fiscal Year, Defendant Klevorn received

$351,940 in total compensation from the Company. This included $135,000 in fees earned or paid in cash, $190,129 in stock awards, and $26,811 in all other compensation.

56.   The 2024 Proxy Statement stated the following about Defendant Klevorn:

Marcy S. Klevorn was initially elected to the Board in February 2021. Ms. Klevorn was formerly the Chief Transformation Officer of Ford Motor Company from May 2019 until her retirement in October 2019. In this role, she accelerated the company's transformation by helping to refine its corporate governance systems, facilitate faster adoption of agile teams across the business and ensure process improvements across the enterprise. She also facilitated strategic partnerships with key technology partners and supported the company's diversity efforts. Having joined Ford Motor Company in 1983, Ms. Klevorn served in key executive and leadership roles within the company's information technology organization including Director of the Office of the Chief Information Officer and Group Vice President of Information Technology. Ms. Klevorn also served as Executive Vice President and President of Ford Smart Mobility LLC, a division of Ford Motor Company, where she oversaw certain acquisitions and other investments and helped to accelerate the company's plans to design, build, grow and invest in emerging mobility services and global data insight and analytics. Ms. Klevorn currently serves on the Board of Directors of Northern Trust Corporation and Cerence Inc. in addition to a few privately held companies.

57.   Upon information and belief, Defendant Klevorn is a citizen of Michigan.

**Defendant Mesquita**

58.   Defendant Mesquita has served as a Company director since February 2021. He also serves as a member of the Technology Committee. For the 2022 Fiscal Year, Defendant Mesquita received $312,409 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $189,969 in stock awards, and $2,440 in all other compensation. For the 2023 Fiscal Year, Defendant Mesquita received $351,585 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $190,129 in stock awards, and $41,456 in all other compensation.

59.   The 2024 Proxy Statement stated the following about Defendant Mesquita:

Jorge S. Mesquita was initially elected to the Board in February 2021. Mr. Mesquita was formerly Chief Executive Officer of BlueTriton Brands from

July 2021 until March 2022. In this role Mr. Mesquita led the company's initiatives to expand market leadership, advance commitment to sustainability and environmental stewardship and to realize the potential of the company's portfolio of water brands.

Prior to joining BlueTriton Brands, Mr. Mesquita was formerly the Executive Vice President, Worldwide Chairman, Consumer of Johnson & Johnson (J&J) from December 2014 until February 2019, where he was responsible for increasing the competitiveness of J&J's consumer business through a comprehensive transformational strategy. In this role, Mr. Mesquita served on J&J's Executive Committee and led the Consumer Group Operating Committee. Prior to that, Mr. Mesquita spent 29 years with The Procter & Gamble Company (P&G), where he held various roles leading P&G consumer product business units. During his tenure at P&G, Mr. Mesquita served as Group President – New Business Creation and Innovation from March 2012 until June 2013, Group President – Special Assignment from January 2012 until March 2012, Group President, Global Fabric Care from 2007 to 2011 and President, Global Home Care from 2001 to 2007, also serving as President of Commercial Products and President of P&G Professional from 2006 to 2007. Mr. Mesquita currently serves on the Board of Directors of Mondelez International, Inc.

60.     Upon information and belief, Defendant Mesquita is a citizen of Kentucky.

**Defendant Smith**

61.     Defendant Smith has served as a Company director since September 2022. He also serves as a member of the Technology Committee and as a member of the Organization & Compensation Committee. For the 2022 Fiscal Year, Defendant Smith received $310,351 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $190,157 in stock awards, and $194 in all other compensation. For the 2023 Fiscal Year, Defendant Smith received $311,070 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $190,129 in stock awards, and $941 in all other compensation.

62.     The 2024 Proxy Statement stated the following about Defendant Smith:

Brad D. Smith was initially elected to the Board in September 2022. Mr. Smith is the President of Marshall University, having held this position since January 2022. Prior to joining Marshall, Mr. Smith was Executive Chairman of the Board of Intuit Inc. from January 2019 until January 2022 and Chairman from January 2016 until January 2019, following 11 years as Intuit's President and CEO from January 2008

until December 2018. Mr. Smith began his career at Intuit in February 2003, and prior to his time as President and CEO, he served in various leadership positions within the company. Prior to joining Intuit, Mr. Smith held several executive positions with ADP, where he served from 1996 to 2003. Mr. Smith holds a Bachelor of Business Administration degree from Marshall University and a Master's degree in Management from Aquinas College. Mr. Smith currently serves on the Board of Directors of Amazon.com, Inc.

63.     Upon information and belief, Defendant Smith is a citizen of West Virginia.

**Defendant Jones**

64.     Defendant Jones served as a Company director from 1993 until April 20, 2023. During that time, he served as a member of the Executive Committee, as a member of the Organization & Compensation Committee, and as the Chair of the Nominating, Governance & Sustainability Committee. For the 2022 Fiscal Year, Defendant Jones received $285,196 in total compensation from the Company. This included $147,000 in fees earned or paid in cash, $189,969 in stock awards, $94,279 in change in pension value and nonqualified deferred compensation earnings, and $42,506 in all other compensation. For the 2023 Fiscal Year, Defendant Jones received $382,097 in total compensation from the Company. This included $49,000 in fees earned or paid in cash, $63,543 in stock awards, $224,175 in change in pension value and nonqualified deferred compensation earnings, and $45,379 in all other compensation.

65.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Jones made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| December 21, 2022 | 15,000 | $501.72 | $7,525,800 |

Thus, in total, before the fraud was exposed, he sold 15,000 shares of Company stock on inside information, for which he received approximately $7,525,800 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and

omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

66.     The Schedule 14A filed with the SEC on March 9, 2022 ("2022 Proxy Statement") stated the following about Defendant Jones:

> David A. Jones, Jr. was initially elected to the Board in May 1993 and served as Chairman of the Board of the Company from April 2005 through August 2010, and Vice Chairman of the Board from September 1996 through April 2005. He is Chairman of Chrysalis Ventures, LLC, headquartered in Louisville, Kentucky, and also serves on the board of directors of several charitable, civic and privately held companies.
>
> As a successful venture capitalist, the Board believes that Mr. Jones brings strategic insight and leadership and a wealth of experience in health care to the Board, both in the Company's core businesses as well as in emerging technologies and business models.

67.     Upon information and belief, Defendant Jones is a citizen of Kentucky.

**Defendant O'Brien**

68.     Defendant O'Brien served as a Company director from 2006 until April 20, 2023. During that time, he served as a member of the Investment Committee and as the Chair of the Organization & Compensation Committee. For the 2022 Fiscal Year, Defendant O'Brien received $373,110 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $189,969 in stock awards, and $43,141 in all other compensation. For the 2023 Fiscal Year, Defendant O'Brien received $151,464 in total compensation from the Company. This included $46,700 in fees earned or paid in cash, $63,543 in stock awards, and $41,221 in all other compensation.

69.     The 2022 Proxy Statement stated the following about Defendant O'Brien:

> James J. O'Brien was initially elected to the Board in April 2006. Until his retirement on December 31, 2014, Mr. O'Brien was the Chairman of the Board and Chief Executive Officer of Ashland Inc. Prior to being named to this position, Mr. O'Brien was President and Chief Operating Officer of Ashland Inc., and before that, Senior Vice President and Group Operating Officer. He also serves on the board of directors of Albemarle Corporation and Eastman Chemical Company.

As a highly respected leader in the global business community with an extraordinary track record of success, the Board believes that Mr. O'Brien's breadth of management experience adds valuable expertise and insight to the Board.

70.     Upon information and belief, Defendant O'Brien is a citizen of Kentucky.

**Defendant McDonald**

71.     Defendant McDonald served as a Company director from 2006 until April 20, 2023. During that time, he served as a member of the Audit Committee and as a member of the Investment Committee. For the 2022 Fiscal Year, Defendant McDonald received $355,846 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $189,969 in stock awards, and $45,877 in all other compensation. For the 2023 Fiscal Year, Defendant McDonald received $356,159 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $190,129 in stock awards, and $46,030 in all other compensation.

72.     The 2022 Proxy Statement stated the following about Defendant McDonald:

William J. McDonald was initially elected to the Board in October 2007. Mr. McDonald is the managing partner of Wild Irishman Advisory, LLC, a marketing consulting firm. Prior to that, he was Executive Vice President, Brand Management of Capital One Financial Corporation, having held that position from 1998 until his retirement in 2013. Mr. McDonald also serves on the advisory board of The University of Texas at Austin Longhorn Family Leadership Council.

The Board believes that Mr. McDonald's service in various senior executive marketing positions contributes significant experience and expertise in brand development, marketing and related disciplines.

73.     Upon information and belief, Defendant McDonald is a citizen of Colorado.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

74.     By reason of their positions as officers, directors, and/or fiduciaries of Humana and because of their ability to control the business and corporate affairs of Humana, the Individual Defendants owed Humana and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Humana in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Humana and its shareholders so as to benefit all shareholders equally.

75.     Each director and officer of the Company owes to Humana and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Humana, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

77.     To discharge their duties, the officers and directors of Humana were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Humana, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised Humana's Board at all relevant times.

79.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

80.     To discharge their duties, the officers and directors of Humana were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Humana were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kentucky, and the United States, and pursuant to Humana's own Code of Conduct for CEO and Senior Financial Officers, Ethics Every Day Guide, and Corporate Governance Guidelines (collectively, the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Humana conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Humana and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Humana's operations would comply with all applicable laws and Humana's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

81.     Each of the Individual Defendants further owed to Humana and the shareholders the duty of loyalty requiring that each favor Humana's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

82.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Humana and were at all times acting within the course and scope of such agency.

83.     Because of their advisory, executive, managerial, directorial, and controlling positions with Humana, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Humana.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Humana was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Humana and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

90.     Humana, headquartered in Louisville, Kentucky, is the fourth largest health insurance provider in the United States. The Company's insurance segment provides services to

approximately 17 million members and, in 2023, made up 97.1% of the Company's retail revenues. Humana's insurance services include individual Medicare plans (which constitute about 74% of the Company's retail revenues), group Medicare plans (which constitute about 6.5% of the Company's retail revenues), prescription drug plans, commercially fully-insured plans, and specialty medical benefit plans.

91.     On July 27, 2022, Humana issued a press release that announced the Company's financial results for the second quarter of 2022, reporting EPS of $8.67 for the second quarter, an "outperformance" of approximately $1.00 per share higher than Humana's prior projections. The press release stated that Humana's "outperformance" was "driven primarily by . . . better-than-anticipated medical cost trends in the company's individual Medicare Advantage and Medicaid businesses" and further explained that medical costs for Humana's individual Medicare Advantage business were "running favorable to our expectations."

92.     During the Relevant Period, the Individual Defendants caused Humana to represent to the investing public that "in-patient unit costs and non-in-patient trends [were] coming in lower than [Humana] initially estimated" and that "there really isn't pent-up demand that [Humana has] to be concerned about" negatively affecting utilization rates and profitability.

93.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Humana's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1) Humana had downplayed the negative effects that elevated medical costs arising from pent-up demand for healthcare procedures as the COVID-19 pandemic waned would have on Humana's adjusted EPS; (2) due to the foregoing, Humana experienced elevated utilization rates and costs; (3) the Company failed to maintain internal controls; and (4)

in light of the above, the individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

94.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing Humana to repurchase its own stock at artificially inflated rates. Indeed, between November 2022 and January 2024, approximately 6.5 million shares of Humana common stock were repurchased. Since the repurchased stock was only worth $355.36 per share, which was the adjusted price at close of trading on January 24, 2024, Humana overpaid by over $787 million.

95.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

**False and Misleading Statements**

***July 27, 2022 Current Report on Form 8-K***

96.     On July 27, 2022, Humana filed a current report on Form 8-K with the SEC. The Form 8-K, in reporting Humana's second quarter of the 2022 Fiscal Year financial results, stated that adjusted EPS was $8.67 for the quarter, which was an "outperformance" of about $1.00 per share higher than Humana's prior estimate, which was "driven primarily by . . . better-than-anticipated medical cost trends in the company's individual Medicare Advantage and Medicaid businesses, partially offset by higher than expected non-inpatient utilization in group Medicare Advantage." The Form 8-K also maintained that low utilization rates would continue into the future and raised its adjusted EPS guidance by $0.25 per share to "approximately $24.75" for the full 2022 Fiscal Year because of "lower utilization trends and lack of COVID-19 headwind seen to date."

*July 27, 2022 Earnings Conference Call*

97.     That same day, on July 27, 2022, Humana held an earnings conference call with analysts and investors to discuss the Company's second quarter of the 2022 Fiscal Year financial results. During the call, Defendant Diamond stated that lower inpatient utilization rates was due to reduced spread of the flu, "continued inpatient-to-outpatient shifts," and "improved impact from some of [Humana's] utilization management programs." Defendant Diamond further indicated that these factors would continue to favorably impact utilization rates, stating, "we don't have any reason to think that inpatient to outpatient or the positive utilization management impacts won't continue for the rest of the year, and so that is contemplated in our full year guide." Defendant Diamond professed a elevated utilization rate in Humana's group Medicare Advantage segment that "has turned out to be more reflective of just deferred utilization and pent-up demand," but reasoned that this "pent-up demand . . . may still moderate in the back half of the year," and comforted investors that "we'll certainly continue to monitor it."

*September 15, 2022 Investor Day Conference*

98.     On September 15, 2022, Humana hosted its annual Investor Day conference. During the conference, Defendant Diamond stated that medical costs for the Company's individual Medicare Advantage business were "running favorable to our expectations," powered by "lower-than-expected in-patient utilization." Defendant Diamond further stated that "those trends have continued in the recent weeks" with "in-patient unit costs and non-in-patient trends coming in lower than [Humana] initially estimated."

99.     Also, during the Investor Day Conference, Defendant Diamond represented that even though elevated utilization in the first quarter of the 2022 Fiscal Year had been "potentially due to pent-up demand," Humana was "seeing positive current year restatements and moderating

trends" in its group Medicare Advantage segment, including moderating surgical trends over the second quarter of the 2022 Fiscal Year.

### *November 2, 2022 Form 10-Q*

100.    On November 2, 2022, the Company filed its quarterly report for the third quarter of the 2022 Fiscal Year on Form 10-Q with the SEC (the "Q3 2022 10-Q"). Attached to the Q3 2022 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Broussard and Diamon attesting to its accuracy.

101.    The Q3 2022 10-Q reported that the benefits expense ratio for the Company's retail segment, which includes the insurance segment, fell to 86.5%, down from 88.1% in the third quarter of the prior year. The Q3 2022 10-Q stated the drop was "primarily [] to the favorable impact of higher per member individual Medicare Advantage premiums and lower inpatient utilization associated with the individual Medicare Advantage business."

### *November 2, 2022 Earnings Conference Call*

102.    That same day, November 2, 2022, Humana held an earnings conference call with analysts and investors to discuss the Company's third quarter of the 2022 Fiscal Year financial performance. During the call, Defendant Diamond repeated that group Medicare Advantage utilization was moderating during the third quarter of the 2022 Fiscal Year "suggesting that some of the higher trend we described previously was likely due to pent-up demand," and represented that utilization would further moderate as the Centers for Medicare & Medicaid Services ("CMS") removed certain items from its inpatient-only list and "inpatient to outpatient movement" continued. Defendant Diamond also stated that Humana was "counting on sort of normal course baseline utilization trends."

### *January 9, 2023 J.P Morgan Healthcare Conference*

103.    On January 9, 2023, certain of the Individual Defendants represented Humana at the Annual J.P Morgan Healthcare Conference. In replying to an analyst's question regarding "pent-up demand" for healthcare procedures and the impact on "inpatient/outpatient utilization levels compared to [the Company's] initial expectations," Defendant Diamond stated that after a spike in COVID rates, "we would see some, what we call, above baseline utilization[,] [b]ut then it would typically in a . . . reasonable period of time come back down." Defendant Diamond went on to state that because "[w]e haven't had any of those major surges of COVID in a while. . . . our view would be that there really isn't pent-up demand that we have to be concerned about." In replying to a question about possible increases in surgeries in 2023, Defendant Diamond again represented that "[w]e haven't seen anything that we would call an outlier or have a significant concern."

*February 1, 2023 Earnings Conference Call*

104.    On February 1, 2023, Humana held an earnings conference call with analysts and investors to discuss financial results for the fourth quarter of the 2022 Fiscal Year. During the call, Defendant Diamond emphasized the performance of Humana's Medicaid business during the quarter, referencing "lower-than-anticipated medical costs" and emphasizing that the "favorable utilization seen throughout the year in [Humana's] commercial group medical and specialty businesses persisted in the fourth quarter." Defendant Diamond also disregarded concerns about a upcoming utilization increase due to pent-up demand, stating that "based on all the analysis we've done, we don't believe there's a large amount of pent-up demand sort of that needs to work its way through the system" and that the Company's guidance "does not have an explicit assumption around pent-up demand, but rather just taking the resulting sort of baseline trend we experienced in 2022."

### February 1, 2023 Current Report on Form 8-K

105.    On February 1, 2023, Humana filed a current report on Form 8-K with the SEC. The Form 8-K, in reporting Humana's fourth quarter of the 2022 Fiscal Year financial results and guidance for the full 2023 Fiscal Year, provided projections for the insurance segment's benefit ratio to be between 86.3% and 87.3% for the full 2023 Fiscal Year.

### 2022 10-K

106.    On February 16, 2023, Humana filed its annual report on Form 10-K with the SEC for the year ended December 31, 2022 (the "2022 10-K"), which was signed by Defendants Diamond, Broussard, Hilzinger, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, Smith, Jones, O'Brien, and McDonald. Attached to the 2022 10-K were SOX certifications signed by Defendants Broussard and Diamond attesting to its accuracy.

107.    The 2022 10-K stated that Humana's consolidated benefit ratio fell 40 basis points from 86.7% in the 2021 period to 86.3% in the 2022 period "primarily due to higher per member individual Medicare Advantage premiums and lower inpatient utilization associated with the individual Medicare Advantage business."

### 2023 Proxy Statement

108.    On March 8, 2023, the Company filed the 2023 Proxy Statement with the SEC. The 2023 Proxy Statement was solicited by Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, Smith, Jones, and O'Brien pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

109.    The 2023 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt,

Katz, Klevorn, Mesquita, McDonald, and Smith to the Board; (2) the ratification of PricewaterhouseCoopers LLP as the Company's independent auditors for the 2023 Fiscal Year; and (3) executive compensation, on an advisory basis.

110.   Regarding the Board's Oversight of Risk, the 2023 Proxy Statement stated the following, in relevant part:

> While management is responsible for designing and implementing the Company's risk management process, controls and oversight, the Board, both as a whole and through its committees, has overall responsibility for oversight of the Company's risk management. The full Board regularly reviews risks that may be material to the Company, including those detailed in the Audit Committee's reports and as disclosed in the Company's quarterly and annual reports filed with the SEC. While the Board has established committees designated for various oversight functions, it is common practice for committees to collaborate on overlapping issues. The Company's Enterprise Risk Management (ERM) governance structure consists of oversight from the Board and the Audit Committee (in collaboration with material risks overseen by other committees), and implementation through the Company's management team utilizing a three lines of defense model to delegate responsibility for critical risk management processes across the business functions and operational areas, as well as risk management, compliance, and internal audit teams.
>
> Humana's first line of defense consists of business areas and operational teams across the Company, and is responsible for identifying, assessing, mitigating, monitoring, and managing risk within their respective areas. The Company's Enterprise Risk Management and Regulatory Compliance departments represent the Company's second line of defense. These teams are led by Humana's Chief Legal Officer (CLO), to whom the Chief Risk Officer (CRO) and Chief Compliance Officer (CCO) each report and lead the Enterprise Risk Management and Regulatory Compliance functions, respectively. Humana's Internal Audit Consulting Group (IACG) represents the third line of defense, which provides independent and objective assurance to senior management and the Board regarding first and second line risk management functions, internal control systems, and governance processes.
>
> The Board and each Committee receive updates no less than quarterly, with the CRO, CCO, and IACG updating the Audit Committee on the assessment, monitoring and mitigation of risks material to the Company in the short, intermediate, and long-term, the effectiveness of the Company's control environment in managing these risks, the functioning of the Company's internal controls and procedures, and the identification and analysis of key emerging risks.

The goal of the Company's ERM governance is to achieve robust and thoughtful board-level attention to the Company's risk management process and system, the nature of the material risks faced by the Company, and the adequacy of the Company's risk management process and system designed to respond to and mitigate these risks, each in a manner that closely aligns to the Company's disclosure controls and procedures.

111.   With respect to the Company's Code of Ethics and Code of Conduct, the 2023 Proxy Statement stated the following:

The Company has adopted the "Code of Conduct for the Chief Executive Officer and Senior Financial Officers," which we refer to as the Executive Code of Ethics, violations of which are reported to the Audit Committee. In addition, we operate under the omnibus Humana Inc. Ethics Every Day, which we refer to as the Code of Ethics, which applies to all associates (including executive officers) and directors. The Humana Ethics Office is responsible for the design and enforcement of our ethics policies, the goal of which is to create a workplace climate in which ethics is so integral to day-to-day operations that ethical behavior is self-enforcing. All employees are required annually to review and affirm in writing their acceptance of the Code of Ethics. The Code of Ethics and the Executive Code of Ethics may be viewed on our website at www.humana.com. Any waiver for directors or executive officers from the provisions of the Code of Ethics or the Executive Code of Ethics must be made by the Board of Directors and will be disclosed within four days of the waiver on our website at www.humana.com. To see either the Code of Ethics or the Executive Code of Ethics or any waivers to either policy, go to www.humana.com, then click on "Investor Relations," then click on "Corporate Governance," and then click on the relevant link.

112.   The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and Code of Conduct were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics and Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

113.   The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) Humana had downplayed the negative effects that elevated medical costs arising

from pent-up demand for healthcare procedures as the COVID-19 pandemic waned would have on Humana's adjusted EPS; (2) due to the foregoing, Humana experienced elevated utilization rates and costs; (3) the Company failed to maintain internal controls; and (4) in light of the above, the individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

114. As a result of Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, Jones, O'Brien, and Smith causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *April 26, 2023 Current Report on Form 8-K*

115. On April 26, 2023, the Company filed a current report on Form 8-K with the SEC that reported Humana's first quarter of the 2023 Fiscal Year financial results. The Form 8-K stated that Humana increased the full 2023 Fiscal Year adjusted EPS guidance by $0.25 per share to "at least $28.25" per share.

### *April 26, 2023 Press Release*

116. In a press release issued that same day, Defendant Broussard emphasized Humana's "strong start to the year," powered by "strong membership growth and favorable inpatient utilization trends in our individual Medicare Advantage business."

### *May 9, 2023 Bank of America Securities 2023 Healthcare Conference*

117. On May 9, 2023, Defendants Broussard and Diamond attended the Bank of America Securities 2023 Healthcare Conference for Humana. In replying to an analyst's question

pertaining to strong volume numbers being reported by medical providers, Defendant Diamond maintained that Humana "did contemplate that we would see normalized trend development in 2023, off of our 2022 baseline" and that Humana "did plan for a normalized trend, and you can think of that as just sort of typical trend that you would apply for utilization and unit cost on top of your starting point." Defendant Diamond also stated that "we'll certainly continue to watch the trends develop over the rest of the year," but that "so far, what we're seeing is . . . slightly favorable [utilization] expectations on the inpatient side" that are "consistent, if not slightly positive for the first quarter."

### *June 1, 2023 Current Report on Form 8-K*

118.    On June 1, 2023, the Company filed a current report on Form 8-K with the SEC that reconfirmed Humana's full 2023 Fiscal Year adjusted EPS guidance of at least $28.25 per share.

119.    The statements made in ¶¶ 96-107 and 115-118 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to shareholders and investors that: (1) Humana had downplayed the negative effects that elevated medical costs arising from pent-up demand for healthcare procedures as the COVID-19 pandemic waned would have on Humana's adjusted EPS; (2) due to the foregoing, Humana experienced elevated utilization rates and costs; (3) the Company failed to maintain internal controls; and (4) in light of the above, the individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### **The Truth Emerges**

120.    On June 13, 2023, the truth began to emerge when UnitedHealth, one of the Company's main health insurance competitors, revealed that it was seeing "higher levels" of outpatient care activity and suggested that elevated utilization rates were occurring because of "pent-up demand or delayed demand being satisfied." Further, UnitedHealth revealed that it was "seeing very strong volumes" in certain areas, such as ambulatory surgery, and an overall "higher number of cases that are being performed." Since Humana and UnitedHealth's businesses are so similar, UnitedHealth's disclosure revealed that Humana was probably experiencing elevated utilization and costs from pent-up demand as well.

121.    On this news, the price per share of Humana stock fell $57.63, or 11%, from closing at a price of $512.63 per share on June 13, 2023, to close at a price of $455.00 per share on June 14, 2023.

122.    Three days later, on June 16, 2023, the truth continued to emerge when Humana admitted that it also was experiencing "higher than anticipated non-inpatient utilization trends, predominately in the categories of emergency room, outpatient surgeries, and dental services, as well as inpatient trends that have been stronger than anticipated in recent weeks, diverging from historical seasonality patterns." The Company also revealed that, regarding its prior forecast for its insurance segment benefits expense ratio of between 86.3% and 87.3%, it now anticipated to end the year at the higher end of that range. Further to the point, Humana noted that it now "assume[d] it will continue to experience moderately higher-than-expected trends for the remainder of the year." The Company also revealed that it had already considered the elevated utilization rates in connection with bids it submitted to CMS in connection with the 2024 Medicare Advantage program eleven days earlier, on June 5, 2023.

123.     On this news, the price per share of Humana stock fell $18.20, from closing at a price of $463.85 per share on June 15, 2023, to close at a price of $445.65 per share on June 16, 2023.

124.     On November 1, 2023, during an earnings conference call with analysts and investors, Defendant Diamond revealed that Humana was "planning for the higher level of utilization seen in the third quarter to continue for the remainder of the year." Defendant Diamond further revealed that the Company was "increasing [its] full year insurance segment benefit ratio guidance to approximately 87.5%, which implies a fourth quarter ratio of 89.5%[.]" Despite the increased benefits expense ratio, the Company reaffirmed its 2023 adjusted EPS guidance of "at least" $28.25 per share.

125.     On January 18, 2024, the truth continued to emerge when the Company preliminarily released its financial results for the fourth quarter and full-year 2023 through a current report filed on Form 8-K with the SEC. The Form 8-K revealed that "higher than anticipated cost trends are expected to result in a fourth quarter 2023 Adjusted Insurance segment benefit ratio of approximately 91.4 percent as compared to the Company's previous expectation of 89.5 percent, and a full year Adjusted Insurance segment benefit ratio of approximately 88.0 percent as compared to the Company's previous expectation of 87.5 percent."

126.     The Form 8-K also revealed that Humana was "unable to offset the entirety of the higher than anticipated medical costs that continued to increase through the end of the fourth quarter[,]" and, as a result, anticipated about $26.09 in adjusted EPS for the full year 2023.

127.     On this news, the price per share of Humana stock fell $35.78, from closing at a price of $447.76 per share on January 17, 2024, to close at a price of $411.98 per share on January 18, 2024.

128.     On January 25, 2024, the truth fully emerged when Humana issued a press release that revealed a loss for the fourth quarter of 2023 and that the Company anticipated the higher level of medical costs would continue for the entirety of 2024. Specifically, the press release revealed that Human had taken a loss of $4.42 per share (adjusted loss per share of $0.11) for the fourth quarter of the 2023 Fiscal Year that was "driven by higher than anticipated inpatient utilization . . . and a further increase in non-inpatient trends," and further revealed that the Company anticipated that the elevated level of medical costs would "persist throughout 2024." As a result, the press release revealed that Humana anticipated 2024 adjusted EPS of just $16 per share, a $10 per share decrease from the 2023 Fiscal Year.

129.     On this news, the price per share of Humana stock fell $47.04, or 12%, from closing at a price of $402.40 per share on January 24, 2024, to close at a price of $355.36 per share on January 25, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

130.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $3.4 billion to repurchase approximately 124,254,060 shares of its own common stock.

131.     According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company purchased 1,518,996 shares of its own common stock at an average price per share of approximately $534.02, for a total cost to the Company of approximately $811,174,244.

132.    As the Company's stock was actually worth only $355.36 per share[1], the price at closing on January 25, 2024, the Company overpaid by approximately $271,383,825 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

133.    According to the 2022 10-K, between December 1, 2022 and December 31, 2022, the Company purchased 353,604 shares of its own common stock at an average price per share of approximately $534.02, for a total cost to the Company of approximately $188,831,608.

134.    As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $63,174,891 for repurchases of its own stock between December 1, 2022 and December 31, 2022.

135.    According to the quarterly report filed on Form 10-Q with the SEC on April 26, 2023 ("Q1 2023 10-Q"), between March 1, 2023 and March 31, 2023, the Company purchased 134,490 shares of its own common stock at an average price per share of approximately $495.68, for a total cost to the Company of approximately $66,664,003.

136.    As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $18,871,637 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

137.    According to the quarterly report filed on Form 10-Q with the SEC on August 2, 2023 ("Q2 2023 10-Q"), between April 1, 2023 and April 30, 2023, the Company purchased 226,434 shares of its own common stock at an average price per share of approximately $508.44, for a total cost to the Company of approximately $115,128,103.

---

[1] On January 25, 2024, the Company's common stock had a closing price of $355.36 per share and an adjusted closing price of $353.59 per share. These repurchase calculations use the $355.36 per share figure.

138.     As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $34,662,517 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

139.     According to the Q2 2023 10-Q, between May 1, 2023 and May 31, 2023, the Company purchased 255,595 shares of its own common stock at an average price per share of approximately $521.70, for a total cost to the Company of approximately $133,343,912.

140.     As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $42,515,672 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

141.     According to the Q2 2023 10-Q, between June 1, 2023 and June 30, 2023, the Company purchased 602,096 shares of its own common stock at an average price per share of approximately $464.53, for a total cost to the Company of approximately $279,691,655.

142.     As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $65,730,820 for repurchases of its own stock between June 1, 2023 and June 30, 2023.

143.     According to the quarterly report filed on Form 10-Q with the SEC on November 1, 2023 ("Q3 2023 10-Q"), between July 1, 2023 and July 30, 2023, the Company purchased 368,823 shares of its own common stock at an average price per share of approximately $442.65, for a total cost to the Company of approximately $163,259,501.

144.     As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $32,194,560 for repurchases of its own stock between July 1, 2023 and July 30, 2023.

42

145. According to the Q3 2023 10-Q, between August 1, 2023 and August 31, 2023, the Company purchased 287,179 shares of its own common stock at an average price per share of approximately $484.30, for a total cost to the Company of approximately $139,080,790.

146. As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $37,028,860 for repurchases of its own stock between August 1, 2023 and August 31, 2023.

147. According to the Q3 2023 10-Q, between September 1, 2023 and September 30, 2023, the Company purchased 154,886 shares of its own common stock at an average price per share of approximately $473.51, for a total cost to the Company of approximately $73,340,070.

148. As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $18,299,781 for repurchases of its own stock between September 1, 2023 and September 30, 2023.

149. According to the annual report filed on Form 10-K with the SEC on February 15, 2024 ("2023 10-K"), between October 1, 2023 and October 31, 2023, the Company purchased 220,245 shares of its own common stock at an average price per share of approximately $507.67, for a total cost to the Company of approximately $111,811,779.

150. As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $33,545,516 for repurchases of its own stock between October 1, 2023 and October 31, 2023.

151. According to the 2023 10-K, between November 1, 2023 and November 30, 2023, the Company purchased 860,260 shares of its own common stock at an average price per share of approximately $485.36, for a total cost to the Company of approximately $417,535,794.

152.     As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $111,833,800 for repurchases of its own stock between November 1, 2023 and November 30, 2023.

153.     According to the quarterly report filed on Form 10-Q with the SEC on April 24, 2024 ("Q1 2024 10-Q"), between January 1, 2024 and January 31, 2024, the Company purchased 1,572,566 shares of its own common stock at an average price per share of approximately $392.11, for a total cost to the Company of approximately $616,618,854.

154.     As the Company's stock was actually worth only $355.36 per share, the price at closing on January 25, 2024, the Company overpaid by approximately $57,791,801 for repurchases of its own stock between January 1, 2024 and January 31, 2024.

155.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $787 million.

### DAMAGES TO HUMANA

156.     As a direct and proximate result of the Individual Defendants' conduct, Humana will lose and expend many millions of dollars.

157.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

158.     Such losses include the Company's overpayment of over $787 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

159.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the

Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

160.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

161.   As a direct and proximate result of the Individual Defendants' conduct, Humana has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

162.   Plaintiff brings this action derivatively and for the benefit of Humana to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Humana, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act and the aiding and abetting thereof.

163.   Humana is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164.   Plaintiff is, and has been at all relevant times, a shareholder of Humana. Plaintiff will adequately and fairly represent the interests of Humana in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

165.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

166.    A pre-suit demand on the Board of Humana is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eleven individuals: Defendants Hilzinger, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, and Smith (the "Director Defendants") and non-party James A. Rechtin (together with the Director Defendants, the "Directors") . Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time of the filing of this complaint.

167.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $787 million for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

168.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

169.     Additional reasons that demand on Defendant Hilzinger is futile follow. Defendant Hilzinger has served as a Company director since 2003 and as Chairman of the Board since January 2014. Defendant Hilzinger has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Hilzinger also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Hilzinger signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant Hilzinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.     Additional reasons that demand on Defendant Bono is futile follow. Defendant Bono has served as a Company director since 2020. She also serves as a member of the Audit Committee and the Clinical Quality Committee. Defendant Bono has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Bono also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, her re-election to the Board. Furthermore, Defendant Bono signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons,

Defendant Bono breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.     Additional reasons that demand on Defendant D'Amelio is futile follow. Defendant D'Amelio has served as a Company director since 2003. He also serves as a member of the Nominating, Governance & Sustainability Committee and as the Chair of the Audit Committee. Defendant D'Amelio has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant D'Amelio also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant D'Amelio signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant D'Amelio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.     Additional reasons that demand on Defendant Feinberg is futile follow. Defendant Feinberg has served as a Company director since 2022. He also serves as a member of the Nominating, Governance & Sustainability Committee and as the Chair of the Clinical Quality Committee. Defendant Feinberg has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Feinberg also

solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Feinberg signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant Feinberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Frederick is futile follow. Defendant Frederick has served as a Company director since 2020. He also serves as a member of the Organization & Compensation Committee and as a member of the Clinical Quality Committee. Defendant Frederick has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Frederick also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Frederick signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant Frederick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Garratt is futile follow. Defendant Garratt has served as a Company director since 2020. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Defendant Garratt has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to

make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Garratt also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, his re-election to the Board. Furthermore, Defendant Garratt signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant Garratt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.     Additional reasons that demand on Defendant Katz is futile follow. Defendant Katz has served as a Company director since 2019. She also serves as the Chair of the Nominating, Governance & Sustainability Committee and as a member of the Organization & Compensation Committee. Defendant Katz has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Katz also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, her re-election to the Board. Furthermore, Defendant Katz signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant Katz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.     Additional reasons that demand on Defendant Klevorn is futile follow. Defendant Klevorn has served as a Company director since 2021. She also serves as the Chair of the

Technology Committee and as a member of the Audit Committee. Defendant Klevorn has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Klevorn also solicited the false and misleading 2023 Proxy Statement which resulted in, *inter alia*, her re-election to the Board. Furthermore, Defendant Klevorn signed, and thus personally made, the false and misleading statements and omissions in the 2022 10-K. For these reasons, Defendant Klevorn breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

177.    Additional reasons that demand on the Board is futile follow.

178.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $787 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

179.    Defendants Bono, D'Amelio, Garratt, and Klevorn served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Bono, D'Amelio, Garratt, and Klevorn failed to adequately review and discuss the Company's Forms 10-K and 10-Q; failed to adequately exercise their risk management and risk assessment

functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics and Code of Conduct. Thus, Defendants Bono, D'Amelio, Garratt, and Klevorn further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

180.   In violation of the Code of Ethics and Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Ethics and Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Ethics and Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

181.   Humana has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Humana any part of the damages Humana suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

182.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

183.    The acts complained of herein constitute violations of fiduciary duties owed by Humana's officers and directors, and these acts are incapable of ratification.

184.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Humana. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Humana, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

185.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Humana to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

186. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least six of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

187. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

189. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

190. Under the direction and watch of Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, Smith, McDonald,

Jones, and O'Brien, the 2023 Proxy Statement failed to disclose: (1) Humana had downplayed the negative effects that elevated medical costs arising from pent-up demand for healthcare procedures as the COVID-19 pandemic waned would have on Humana's adjusted EPS; (2) due to the foregoing, Humana experienced elevated utilization rates and costs; (3) the Company failed to maintain internal controls; and (4) in light of the above, the individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

191.    Moreover, the 2023 Proxy Statement failed to disclose that the Company's Code of Ethics and Code of Conduct were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics and Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

192.    Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, Jones, O'Brien, and Smith knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

193.    As a result of Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, Jones, O'Brien, and Smith causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-

elect each of them to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

194.     The Company was damaged as a result of Defendants Hilzinger, Broussard, Bono, D'Amelio, Feinberg, Frederick, Garratt, Katz, Klevorn, Mesquita, McDonald, Jones, O'Brien, and Smith's material misrepresentations and omissions in the 2023 Proxy Statement.

195.     Plaintiff, on behalf of Humana, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

196.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.     The Individual Defendants, by virtue of their positions with Humana and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Humana and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Humana to engage in the illegal conduct and practices complained of herein.

198.     Plaintiff, on behalf of Humana, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the
### Securities Exchange Act

199.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.     The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Humana. Not only is Humana now defending claims that it violated Section

10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Humana by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over 6.5 million of its own shares at artificially-inflated prices, damaging Humana.

201.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

202.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Humana not misleading.

203.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Humana.

204.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

205.     By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

206.     Plaintiff, on behalf of Humana, has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

207.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Humana's business and affairs.

209.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

210.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Humana.

211.     In breach of their fiduciary duties owed to Humana, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Humana had downplayed the negative effects that elevated medical costs arising from pent-up demand for healthcare procedures

as the COVID-19 pandemic waned would have on Humana's adjusted EPS; (2) due to the foregoing, Humana experienced elevated utilization rates and costs; (3) the Company failed to maintain internal controls; and (4) in light of the above, the individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

212.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

213.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, netting aggregate proceeds exceeding $30.6 million.

214.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

215.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Humana's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

216.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

217.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Humana has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218.     Plaintiff, on behalf of Humana, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

219.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Humana.

221.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Humana that was tied to the performance or artificially inflated valuation of Humana or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

222.     Plaintiff, as a shareholder and a representative of Humana, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

223.     Plaintiff, on behalf of Humana, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Humana, for which they are legally responsible.

226.    As a direct and proximate result of the Individual Defendants' abuse of control, Humana has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Humana has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.    Plaintiff, on behalf of Humana, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

228.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Humana in a manner consistent with the operations of a publicly held corporation.

230.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Humana has sustained and will continue to sustain significant damages.

231.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

232.    Plaintiff, on behalf of Humana, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

233.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

235.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Humana to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

236.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

237.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

238.    Plaintiff, on behalf of Humana, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Broussard and Diamond for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

239.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

240.    Humana and Defendants Broussard and Diamond are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Broussard's and Diamond's willful and/or reckless violations of their obligations as officers and/or directors of Humana.

241.    Defendants Broussard and Diamond, because of their positions of control and authority as officers and/or directors of Humana, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Humana, including the wrongful acts complained of herein and in the Securities Class Action.

242.    Accordingly, Defendants Broussard and Diamond are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

243.    As such, Humana is entitled to receive all appropriate contribution or indemnification from Defendants Broussard and Diamond.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Humana, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Humana;

(c)     Determining and awarding to Humana the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Humana and the Individual Defendants to take all necessary actions to reform and improve Humana's corporate governance and internal procedures to comply with applicable laws and to protect Humana and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Humana to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Humana restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2024                       Respectfully Submitted,

                                              **THE SKEES LAW OFFICE**

                                              */s/ W. Edward Skees*_____
                                              W. Edward Skees
                                              415 W. 1st Street
                                              New Albany, IN 47150
                                              Telephone: (812) 944-9990
                                              Email: ed@skeeslegal.com

                                              **THE BROWN LAW FIRM, P.C.**
                                              Timothy Brown
                                              767 Third Avenue, Suite 2501
                                              New York, NY 10017
                                              Telephone: (516) 922-5427
                                              Facsimile: (516) 344-6204
                                              Email: tbrown@thebrownlawfirm.net

## **<u>VERIFICATION</u>**

I, Shantavia Spikes, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of September, 2024.


_____
Shantavia Spikes